May it please the court, good morning Chief Judge Traxler, Judge Motz, Judge Harris. My name is Stephen Levine. I have the privilege of... I apologize for saying your name wrong. Quite all right, Your Honor. You're certainly not the first. I have the privilege of representing Mr. Charles Thomson on this case. The willful blindness instruction, the issue I'd like to address first, is a very powerful instruction. The government recognizes that. In fact, in its response brief, the government acknowledges that at the very first charging instruction, it requested that the court give the willful blindness instruction. Only after Mr. Thomson testified, however, this was I believe the third charging conference, did the court agree to give the willful blindness instruction. But the fact that the government asked for it at the very first charging conference demonstrates how powerful the government recognizes this instruction to be. And it's important to point this out because in its brief, the government doesn't rely on anything other than Mr. Thomson's testimony to suggest that there were predicate facts to support the issuance of the instruction. But there were not sufficient predicate facts. And as the Supreme Court put it in Global Tech, the defendant must not only believe that there is a high probability that a fact exists, but also must take deliberate actions to avoid learning of that fact. And in this case, as I indicated, there were not sufficient facts. And in a very close case, as we saw in this one, the government cannot establish that the issuance of the willful blindness instruction was harmless error. The evidence at trial demonstrated that Mr. Thomson was a non-curious type of person, someone who didn't get into other people's business, that he was indifferent in his thoughts. And the law does not require more than that. The law does not require that a defendant be a detective. It doesn't require that he look into the packages to see exactly what he's delivering. Now, it was his understanding that Mr. Jeremy Anderson was involved in a business, an eBay business, which sold shoes and merchandise and other women's merchandise, shoes and purses and clothing. That was his understanding based on what Mr. Anderson showed him and what Mr. Anderson told to him. And in fact, when Mr. Thomson arrived at the warehouse in California in November to transport the load of what he believed to be legitimate merchandise across the country, he looked into the warehouse. So contrary to what the proverbial ostrich does by, I assume, sticking its head in the sand, Mr. Thomson actually stuck his head in the warehouse and all he saw were garbage bags. And there's no evidence that he smelled anything or saw anything that would suggest that this was an illegitimate operation. And there was no evidence to suggest that these activities, which were being conducted in daylight, raised his suspicions whatsoever. So after he looked inside the warehouse, the government relies on the fact that for a few minutes, Mr. Thomson stuck his head into an AA meeting. But that deliberately avoided nothing. All he did was leave while packages were being put on his truck. He didn't avoid watching packages being or merchandise being packed. The fact that he left for a few minutes to attend an AA meeting didn't allow him to avoid anything. There's nothing that he would have seen. I guess the argument would be right. You never know. Like if you get out of the room at the right time, you may avoid a package open. Somebody says something to somebody else. Like he doesn't have to be 100 percent positive that there would have been something incriminating. He just has to think it'd be better just in case if I weren't here. Well, yes, Your Honor, that's the that's the law that, you know, that if he thought he might see something. It doesn't have to be right. That's correct, Your Honor. But putting everything in context, the fact that he stuck his head in the warehouse and saw nothing. Was it your position then that someone for the willful blindness instruction to be appropriate, someone has to sort of consistently all the time stick his head in the sand? No, Your Honor. It can't be sort of arbitrary or erratic, right? The efforts to be willfully blind must be sort of consistent rather than intermittent. It has to be consistent in that one in that particular time frame. If if there were a series, if there were a number of times that Mr. Thompson went to the warehouse and on the first occasion, he there was evidence that he was suspicious and he walked away and then he did it again on the second occasion. By the third occasion, he stops acting in that way. It may be sufficient if there's evidence he was suspicious, but there's no evidence in this case that when he arrived at the California warehouse in the middle of the day and stuck his head into that warehouse, that there was anything suspicious about it. In fact, it's important to point out that he's the one who testified to this. Usually there when their willful blindness instruction from my reading of the cases, it's when somebody when the government puts on evidence that, well, you know, if the government had put on evidence that Mr. Thompson was at the warehouse and Neil Wiley said, hey, Charlie, let me tell you what's in these packages. And Mr. Thompson had said, no, I'd rather not know. But that's the kind of evidence we're used to seeing in the willful blindness instruction contest. But in this case, the government put on no evidence of that. And it was only when Mr. Thompson testified that he was relating what he did that day, that he looked in the warehouse and that he went to an AA meeting. Only then was the willful instruction given. Did you represent him below? I did. You did? I did, yes. Yeah. Well, so, you know, I mean, you know you take the bitter with the sweet when you testify, right? Yes. And I'm sure you informed him of that. And so, you know, if you're going to be testifying, you're putting your version of what happened. And it may be subject to skepticism. It may not hang together as far as maybe you'd be better off. I mean, I'm sure you – I know you're a good lawyer and I know you had that chat with him. And although the district court did focus in on the – on the going to the AA meeting, it seemed to me that it didn't particularly find him too credible. I mean, he was getting a lot of money for transporting this stuff. To address your last point, Your Honor, he wasn't getting a lot of money, and that's part of our objection, which we've raised in our – $40,000? He did not – well, Your Honor, our position is that he did not get $40,000. And if I can turn to that. Was there evidence that he got $40,000? There was – yes, Your Honor, there was testimony by Neal Wiley, who was permitted to leave an impression with the jury that Mr. Thompson charged a rate of $40,000. As we address in our reply brief, strangely, the government uses an ellipsis to remove the critical exchange that occurred between the prosecutor and Mr. Wiley. So contrary – and that's in Joint Appendix 1614 to 1615. Contrary to the government's partial quote, Mr. Wiley was permitted and did testify about a rate that Mr. Thompson allegedly charged. We objected because that testimony lacked foundation. Now, rather than argue that there was sufficient foundation, the government's first response to our position is that Mr. Wiley did not testify that Mr. Thompson charged a rate. But they used an ellipsis to remove that exchange where Mr. Wiley did testify to that. And that's – I think that's critical because when the government's best defense to our argument that there was no foundation for this testimony is that there was no such testimony, that suggests that even the government recognizes that they have a weak argument when they say that it just simply didn't happen. And the fact is, it did. It's in the record, Joint Appendix 1614 to 1615. Now, related to that testimony, Mr. Wiley was permitted to conclude that Mr. Thompson must have known that he was transporting marijuana because the amount he was getting paid, as Judge Matsu just indicated. But there was no foundation for Mr. Wiley's testimony that Mr. Thompson was getting paid that much. So it was a conclusion by Mr. Wiley based on a faulty premise. It should not have been permitted. The government seems to want to have it both ways. On one hand, the government says Wiley didn't testify that Charlie Thompson was paid a particular rate. Yet when Mr. Wiley testifies and concludes that Mr. Thompson must have known he was transporting marijuana because he charged a particular rate, they can't have it both ways. I just want to make sure I'm understanding. I thought that the government's position was, yes, there was testimony that he received that much money, and the only thing that they're contesting was who charged the rate, who set the rate. That's what I thought, too. There were two people who testified about, well, with respect to the rate, looking at June appendix 1614 to 1615. The question was, again, end of November 2012, what was discussed as far as how much it would cost to put the entire load of marijuana on Mr. Thompson's trailer? Answer by Mr. Wiley. Jeremy Anderson had told us, me and Kenny both, that it would be 40 grand. Question, and that was 400 pounds of marijuana? Answer, yes. And this is the part that was ellipsed out to make up a word. Question, what was the standard rate based on your conversations in November 2012? Did you know whether that was the standard rate that Mr. Thompson charged? We objected. The court sustained it, and the question was asked differently. Did you know whether? How did you know what the rate was that Mr. Thompson charged? Again, an objection that this was overruled, and the court now asks, how did you know? And Mr. Wiley answered, all I knew is what he was told, what was told to me by Jeremy Anderson. And so the version that's in the response brief is not complete. And what I've just read is the fact that Mr. Wiley was permitted to testify about a rate, but there was no foundation for that testimony, and he should not have been permitted to testify to it. With respect to the other evidence about a ‑‑ Well, what ‑‑ I'm sorry, help me with this. On 1614, what was the price that Mr. Day, I don't know how you say that, was going to have to pay to not purchase the trailer but use the entire space to transport the load? $40,000. $40,000? Yes. Each trip is what Jeremy had said. And that was objected to and sustained, Your Honor. And what I read was right after that. Right. No, it was after that. Who's testifying to this? Neil Wiley is testifying about a conversation he'd had with Jeremy Anderson, who never did testify. I was always curious about that. Where was Mr. Anderson? He didn't testify. I don't mean at the scene. I'm talking about at the trial. He didn't testify, Your Honor. I could certainly share with the court, well, I think the prosecutor would probably know better than I do, where he was. But he did not testify. Was he charged? He was charged, and I believe he pled guilty. I understand, Your Honor. Now, Mr. Flickman was permitted to testify that out of curiosity he asked Mr. Day how much it was costing. I don't want to misstate, but I'm paraphrasing. He asked Mr. Day how much the transportation was costing. And Mr. Day shared with him $50,000, which is different than the $40,000 that we heard. But that was Mr. Day's answer, and there was an objection because this was not in furtherance of the conspiracy. And for a while, the district court seemed to decide that, well, it was made during the course of the conspiracy. And we didn't suggest it wasn't made during the course of the conspiracy. But there was no evidence that it furthered or was designed to further, which is the critical language in U.S. v. Shures. There was no evidence that that information, that exchange, was designed to further the conspiracy. In fact, Mr. Day didn't offer up the information to Mr. Glickman, and the government relies on the fact that Glickman served as a mentor. But as Mr. Glickman testified, he would serve as a mentor when Mr. Day would come to him, Mr. Glickman, for advice. That was the testimony, 1125, 1126. Day would bring problems to Glickman, and in response, Glickman would give him advice, which wasn't always followed. The point here is that there's no evidence whatsoever that this exchange was designed to further the conspiracy. Mr. Glickman acknowledges that when he says he asked out of curiosity. I see that I'm out of time. Thank you. Thank you. Ms. Smith. Good morning. I'm Chief Judge Traxler, Judge Motz, Judge Harris. I'm Andrea Smith. I'm an assistant United States attorney in the District of Maryland. And I tried the case along with one of my colleagues. I think to begin with, the most critical point to be made is that Mr. Day had a serious problem, and Mr. Thompson was the solution to his problem. Mr. Day was always upset. This permeated the wiretaps and all the testimony by all the cooperating witnesses that all the deliveries were too small or took too long. And there were various reasons for that. But the point being that up until the point where Mr. Thompson joined the conspiracy effort, for 16 months prior to that, Mr. Day received approximately 1,000 pounds of marijuana in those 16 months. In the 25 days that Mr. Thompson, between the two deliveries, he delivered 500 pounds in 25 days. So he was clearly the solution to Mr. Day's problem. Now, also to put context on this, Mr. Thompson, who carried 800 pounds, 400 pounds the first time, 400 pounds the second time, the first trip, 200 went to Mr. Day, and the other 200 went up to Philadelphia. The second trip, 300 went to Mr. Day, and 100 went up to Philadelphia. Mr. Thompson carried 800 pounds of marijuana, which cost the buyers collectively, based upon the evidence at trial, somewhere between $1.67 million and $2.7 million, depending upon how much they paid per pound. The sellers in California were owed collectively a return of somewhere between $3 million and $3.4 million. So just to put a point at a pebble in the pile, the magnitude of the value of what Mr. Thompson was carrying cannot be ignored. Now, the evidence at trial, and this is sort of to answer both the sufficiency and the willful blindness argument, because the willful blindness argument of willful blindness instruction requires three things. And I would submit to the court that the facts establish that Mr. Thompson was subjectively aware of a high probability that this was a drug operation and that he was hauling these boxes of marijuana came from the government's case. The other two pieces, an assertion that he had no idea and that he purposely avoided learning the facts, came from Mr. Thompson. I'd like also to make the point that the government sought this instruction three times, not just against Mr. Thompson, but against one of the other co-defendants. His name was Anas Hadjifejavic, and he was a Mount Claire, New Jersey, police officer. And so we also had a willful blindness issue there as well. But it wasn't until Mr. Thompson testified and supplied the two missing pieces that Judge Bredar decided to give the instruction. So back to what was the evidence that he was subjectively aware. The evidence that he was subjectively aware. Well, and again, I recognize that not one of these pieces alone may be a smoking gun, if you will, but it is the accumulation of the evidence. So Mr. Thompson's truck and trailer had no DOT number, no company markings, he had no log books, he had no documentation in his truck about deliveries, and both deliveries were made under the cover of darkness. The jury could certainly conclude that he might not be a legitimate hauler. There was also testimony that Mr. Anderson had to be present at the Crush Warehouse when Mr. Thompson delivered the marijuana. Now, number one, that's completely inconsistent with legitimate freight. Number two, you're hiring a hauler, but he dictates the terms to you. He tells you, yes, I'll drive across country, but you have to get on a plane and be there for me. And that wasn't just Mr. Thompson's response. He admitted that on cross. In fact, when I asked him on cross, so you made him spend $1,000 to be there because you just wanted to make sure these shoes and purses got where they were going. His response was, well, I don't know what he spent to fly there. I mean, his answers were absolutely classic avoidance. It wasn't just his avoidance of the subject matter. It was the entire demeanor of his testimony. He required Jeremy Anderson to be there, and he never goes to the front door to say, hi, I'm here with a delivery. He goes around back. Then there was Detective Weyer's surveillance of him when he left Maryland the first time and drove all the way to Philadelphia in the right-hand lane going 51 miles per hour exactly. Why do that? I never saw an explanation for why he was driving that speed. Well, Mr. Glickman pointed out in his testimony when there was a heated debate between him and defense counsel on cross-examination about what you'd have to pay a driver more if he knew and less if he didn't know. And Mr. Glickman pointed out that it's sometimes worse if a driver doesn't know because he won't be careful. And then on redirect, he explained they don't follow the traffic rules if they don't know they're carrying something that would draw attention. The detective, the narcotics detective, was particularly struck for three hours, right-hand lane, 51 miles per hour going to Philadelphia. Then you really sort of strike, that particular argument strikes me about the reasonable articulable suspicion. I mean, you're either going to or from or city or you do look nervous or don't look nervous. All of those things count against you. It doesn't matter what you do. So here he's obeying the speed limit. That counts against him. Well, I absolutely agree how absurd it sounds, but it is in combination that things take a different tone, if you will. They look differently. When you add to that the second delivery, he shows up and he waits in his truck for a half an hour. He doesn't show up. He doesn't bang on the door and say, here's your boxes. Somebody come in and get them. He waits for Jeremy Anderson to show up. And then he goes into the truck with the New Jersey cop and one of the other defendants at trial. It was actually the three on trial. I'm sorry, I take that back. It was the New Jersey cop and Jeremy Anderson go into the back of the trailer and they are in there for 17 full minutes on the video. That is a very long time to not be talking about anything. And that is a very long time. Those boxes must have been so up and hidden away that it took that long for them to get them out of the trailer. Again, just one more pebble in the pile. And then finally, he makes the second delivery. He leaves. He comes back a day or two later and leaves his livelihood. Leaves his truck and his trailer on the lot and it sat there until January 15th. From December 11th to January 15th when the police did the execution search warrants and seized it. He left it there. So, again, it is not an explanation that makes any sense. The testimony of Mr. Wiley was he understood that Mr. Anderson was supposed to drive it back once all the money was collected. Again, these are not things that make any sense. Counsel, can I ask, because this is where I just have trouble conceptually, so I understand everything you are saying. And so it does seem like there was a really strong case that Mr. Thompson actually knew, had actual knowledge here. And that if he didn't, boy, he really should have. Any reasonable person would have. But what's the, I'm still not, I mean, maybe you just haven't gotten there yet. But this is my concern about the case, that you had a really good case that he actually knew what was going on. But if the jury wasn't convinced by that, that he actually knew what was going on, then they were supposed to sort of acquit. And doesn't the willful blindness instruction just give them a way to say, well, you know, it was pretty close. He probably knew what was going on, so we'll commit. I don't think I'm asking this question right. But do you know what I'm saying? So far you've shown me there was a really good case for actual knowledge. But where's the case for willful blindness, that he subjectively knew about a risk, but not that he actually knew it was happening? Well, the testimony of the cooperator, Neil Wiley, was that when Jeremy Anderson sold his transportation cell, if you will, to Mr. Day, he had a driver, they'd been doing this for years. Mr. Thompson takes the witness stand, and oh, that guy Jeremy Anderson, yeah, I used to run into him from time to time. He always had some harebrained scheme. From the minute we started talking about what was going on, he was distancing himself in his answers to Mr. Anderson. Then he describes going to get the, now, Mr. Wiley met him by accident, because Mr. Wiley and Mr. Anderson had already packed the boxes. The government's not suggesting he went to an AA meeting. I don't know where he was. I just know he wasn't there when his personal truck and trailer are being packed by someone who hired him. I mean, that alone doesn't make sense, that your livelihood, you would park it and say, load your stuff and I'll be back. That's just not normal commerce. So then he testifies, yeah, I got there, stuff going on, but I noticed an AA meeting, bunch of cars, what's going on over there? I'm just going to just go. The way he presented it, the judge was just struck by he was almost inventing an alibi or trying to distance himself from what was going on. He was never told it was purses and shoes. When he was asked the question, what did he think was in there, he talked about having seen some of that stuff. So he assumed that was what was in there? I mean, and then the argument becomes by Mr. Levine that that's what he was told and that's what he believed. And the facts don't support those kinds of arguments. Mr. Anderson even explained to Mr. Day in trying to sell their part of the conspiracy that he'd even been pulled over once by dogs. And the dogs hadn't sniffed it because they had this absolute guaranteed way to wrap these boxes in tar paper and roofing paper and everything else. Then there's the fact that the other supplier that was putting drugs on the truck, it was Mr. Wiley and Mr. Anderson who was getting drugs from Paul and Mac. Paul and Mac also were putting drugs on the truck to go to Philadelphia. Paul's the one that fronted the money for Mr. Thompson to buy his trailer. Again, this is certainly starting to look more and more like the guy that is the transportation for the marijuana conspiracy and not some independent trucker. And again, who leaves their truck for someone else to pack? The point that he always had to be there, Anderson always had to be there when they dropped it off. And then Mr. Wiley also explained after the first load went out, the first load of marijuana worth hundreds of thousands of dollars, hundreds of thousands are coming back, maybe even $750,000. Mr. Wiley knew that Anderson drove this money back. And one could argue that it was concealed and he didn't know what it was. But all the money that was seized in this case, $232,000 being driven across country and another $121,000 being driven were all vacuum sealed in clear plastic bags. I'm not suggesting that the jury could make that leap. But what I'm suggesting is you don't send someone with $750,000 of your money if you don't know who he is and if he doesn't know. A couple other points. When Wiley hired Mr. Anderson, he counseled against using the mail because he had a better way. They had never had a problem. And Mr. Wiley testified that Mr. Anderson told me that Thompson wouldn't drop off the marijuana to any random person without him being there because it's a drug deal. And if he doesn't know the people, it would be risky just to show up and deliver something with someone you didn't know, you could get robbed, or who knows what. And that was at JA 1686. Finally, the point that Anderson was making at this dinner with Dei and Wiley about this guaranteed way, this sure way that they had, Jeremy Anderson guaranteed the delivery. He said, if anything happens, I will be responsible. He was literally guaranteeing to Mr. Dei hundreds of thousands of dollars worth of product. He was so sure that him and Mr. Thompson had this thing so well done that he was willing to guarantee that loss. And to me, again, another significant point, and that Mr. Thompson was clearly the solution to the problem. Let me ask you an irrelevant question. I'm just curious. Sure, sir. How do you reconcile these large sums of money being paid Thompson to haul to the fact that his house is in foreclosure? Well, Mr. Thompson's testimony presented a man who dabbled in, he said he wore three or four hats at a time. He was training cutting horses. He was developing feeds. Someone stole money from him. He moved every five years somewhere else. My sense was that Mr. Thompson just wasn't maybe the best manager of life in general. He sort of came across that way. He was also leaving on a cruise. He said his father-in-law was paying for that. That's what he said, yes. That's what he said. So I did want to address the 801 D2E issues very briefly. There's an objection that Mr. Glickman said that Mr. Dei and Mr. Thompson paid $50,000 to drive the marijuana across country on page 1159. There was no objection by defense counsel at that time. It was only later after a heated debate with Mr. Glickman when Mr. Levine said, well, isn't it true you don't have to pay as much to a driver if he doesn't know what he's carrying? What did you say, $50,000? And Mr. Glickman said, yeah, out of curiosity. So he asked the question, number one. Number two, the testimony about you don't have to pay a driver if you don't know came out of his mouth. So then when it was repeated by Mr. Wiley, who was not in the room at the time, who made the same point, Mr. Levine is objecting to Mr. Wiley having said that. In the same passage, Mr. Glickman also testified about blind couriers in answers to Mr. Levine's questions that it's not the right thing to do to send a blind courier. You don't do that if it's your driver. If you can't tell a driver what's in their load, you shouldn't be using him. If the driver doesn't know, he may not be driving as carefully. You don't have to pay him as much if he doesn't know. But Mr. Thompson testified that he got $5,000 for the trip, and that was, of course, after Mr. Glickman testified. But Mr. Levine asked Mr. Glickman, no doubt in preparation, knowing that that was going to be Mr. Thompson's testimony, well, but if you were only paid $5,000, that wouldn't raise any suspicions. And Mr. Glickman, who had been in the apparel industry for years, said he wouldn't pay $5,000 for 16 boxes of purses and shoes. That's ridiculous. The gasoline and the costs and the wear. I mean, he just completely dismissed it out of hand. So then when you get to Mr. Wiley's statements, I've discussed the secure way. It was so secure that Mr. Anderson guaranteed it. The statements that Mr. Wiley made, the foundation was made again and again and again. The question about standard rate, I'm very confused about that. The rate was $40,000. Whether it was a standard rate or a rate somebody set, to me it's sort of like, who cares? But the point is, is that the AUSA who was directing Mr. Glickman said, was that the standard rate? Wiley just said he didn't know. That's what Anderson told him. There was no testimony that he said that. It was the question of the AUSA. And I'm pretty sure that there's a jury instruction that says questions aren't evidence. So I'm just not sure of the big to-do over that. Then Mr. Wiley testified that Mr. Thompson knew. The question was, do you know whether Mr. Thompson knew that he was transporting marijuana on whose truck? Mr. Wiley said yes. The AUSA said, how do you know? Because you wouldn't get paid that if you weren't delivering something. But that is after Mr. Levine had already elicited the same information from Mr. Glickman. So again, I'm not sure how he gets to complain about that. Finally, there's an argument about a cover load. The answer to the question that led to the cover load was that Mr. Thompson didn't like driving around with an empty trailer. There was no objection. The question was why. Mr. Wiley's understanding, consistent with his experience and consistent with other state troopers that testified, was that when there's a car in the car hauler, it looks more legitimate. So these were all-this wasn't an expert opinion. It was just very common sense answers, and it was derived from all of the evidence in the case. Thank you. Thank you. Mr. Levine. May it please the Court. A few points. The government tries to justify the instruction by saying that the Wolf of Linus instruction, by saying that Charlie Thompson, Mr. Thompson, was suspicious, and that's why he wanted Jeremy Anderson, and only Jeremy Anderson, to meet him at the warehouse. And the government said that today. They put that in their brief. But that's just not the record. Mr. Thompson did not require and did not-and testified that he didn't require only that Mr. Anderson be there. Now, if that were the complete story, then perhaps the government would have a stronger argument. That's only half of what Mr. Thompson said. Looking at Joint Appendix 2977 and 2978, the question was, by the prosecutor on cross-examination of Mr. Thompson, Mr. Levine asked you if you were surprised when you got to crush the warehouse, of course, in Maryland, that Jeremy Anderson was there. Answer, yeah. Question. And you said, no, I expected him to be there. Answer, yeah, I-question. You required it. Answer, no, I didn't require it. But I was kind of adamant about not just Jeremy, anyone. I would tell them, you know, please don't make me wait around. Please try to be on time for whatever it is we're doing. And later on, on 2978, Mr. Thompson said he didn't, meaning Mr. Anderson, he didn't have to be there if he would have maybe put me on the phone with someone else. And then he goes on to say he would have been comfortable. He required someone to be there, which is consistent with his practice in delivering other items, which he testified to. So the way the government has suggested, well, he required that Mr. Anderson fly across country, spending thousands of dollars, and Mr. Anderson had to be there. Mr. Thompson himself said somebody had to be there, either Mr. Anderson or somebody. Now, the fact that Mr. Thompson testified he didn't know what it cost Mr. Anderson, that's not deliberate avoidance. It's indifference. And the willful bias instruction is not given when there's indifference. Now, Mr. Thompson was admittedly a quirky fellow. He had worn a number of hats. He had been in Vietnam War. He had served honorably, served, in fact, meritoriously. He had been an alcoholic as a result thereof. He had numerous types of jobs. He was, by his own admission, a quirky guy, and he was indifferent to what Mr. Anderson's, the details of his business. He, in fact, said, I didn't know his business. Well, in fact, he didn't know his business. Mr. Anderson's business was the trafficking of marijuana, and that's what he said. I didn't know his business, but that's indifference. That's not avoidance. The other part I'd like to respond to in my remaining time is that the government's brief conflates the guaranteed way that Mr. Anderson talked about the fact that he and a driver transported marijuana, and he guaranteed that it would arrive. He said it was a sure thing. And we know about this conversation through Neal Wiley's testimony, and so Wiley was permitted to testify that Anderson, during this so-called sales pitch, told Wiley that he had a driver, someone he identified as his uncle, who had a secure way to transport marijuana, and the government cites to Joint Appendix 1682. But in making this argument, the government's conflating that conversation where Mr. Anderson does not identify the driver. He does not put a name to the driver. Only later, in November, at the warehouse, Mr. Wiley is asked, and did you learn the name of Mr. Anderson's driver in November? Yes. That driver's name, and he says that driver's name, was Charlie, Mr. Thompson. So they're conflating an earlier conversation that Mr. Anderson had with Mr. Wiley, where Mr. Anderson, not naming Mr. Thompson, just says, I have a driver. It's a sure thing. And then later on, a driver shows up in November, but there's no testimony that that driver is the same person that Mr. Anderson had previously described. Let me ask you a question before you run out of time. Am I correct in believing that no one ever testified that Thompson saw the marijuana? That is correct. Or was never shown the marijuana? That's right. That's why, with all due respect, Judge Harris, this was a close case of actual knowledge. I mean, we know that because no one testified that Mr. Thompson saw, smelled, was told this was marijuana. We know from the juror's note, and I know there are conditions associated with a juror's note, but we know from the note that it was a very close case. And ultimately, the willful blindness instruction seemed to balance it the way it did. With that, thank you for your time. I'll submit. Thank you. Mr. Levine, we appreciate very much your undertaking representation of this client. Thank you.
judges: William B. Traxler Jr., Diana Gribbon Motz, Pamela A. Harris